## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**UNITED STATES OF AMERICA**                    **CIVIL ACTION**

**VERSUS**                                       **NO. 13-0262**

**ATP OIL & GAS CORPORATION, et al.**           **SECTION: "G"(4)**

### ORDER AND REASONS

Before the Court is Defendant ATP Infrastructure Partners, LP's (hereinafter, "Infrastructure Partners") Motion to Dismiss,[1] wherein it requests the dismissal of all claims against it (Claims 3, 4, and 5). After considering the complaint, the pending motion, the memorandum in support, the opposition, the reply, the presentations at oral argument, the record, and the applicable law, for the following reasons the Court will deny the pending motion.

### I. Background

#### A. *Factual Background*

According to the United States, Defendant ATP Oil & Gas Corporation (hereinafter, "ATP"), is, and all relevant times has been, the operator of ATP Innovator, the facility at issue in this case. ATP was the owner of ATP Innovator from at least 2006 to March 6, 2009.[2] Defendant Infrastructure Partners is a limited partnership formed by ATP on March 6, 2009 to own and operate the ATP Innovator.[3]

The ATP Innovator is a floating production platform facility operating at Lease Block 711 of Mississippi Canyon in the Gulf of Mexico. The ATP Innovator is permanently moored to the sea

---

[1] Rec. Doc. 34.

[2] Rec. Doc. 1 at ¶ 8.

[3] *Id.* at ¶ 9.

floor at a location and is not operating as a vessel or other floating craft, and has been engaged in the production of oil and natural gas.[4] ATP holds the lease interest in Lease Block 711 of Mississippi Canyon.[5] Since at least April 2007, ATP has been allowed to discharge wastewater from the ATP Innovator into the Gulf of Mexico subject to a General Permit issued by the Environmental Protection Agency ("EPA") under the Clear Water Act's ("CWA") National Pollutant Discharge Elimination System ("NPDES").[6] Under this permit, ATP is allowed to discharge a limited amount of oil in its wastewater.[7]

In March 2012, the United States claims that Bureau of Safety and Environmental Enforcement ("BSEE") inspectors aboard the ATP Innovator located a metal tube connected to the permitted NPDES outfall pipe used for overboard discharge of the facility's wastewater.[8] The United States also contends that the "metal tube and connection to the outfall pipe was hidden in the rafters at a location downstream of the treatment units and the NPDES sampling point. Thus, injections from the tube into the outfall pipe are undetectable in NPDES samples."[9]

Further, the metal tubing was connected to a 550-gallon tank of Cleartron ZB-103, an "amide surfactant chemical blended with methanol that, as used, acts to break apart oil molecules into smaller, dispersed droplets."[10] The United States believes that "the Cleartron ZB-103 dispersant was

---

[4]  *Id.* at ¶ 12.

[5]  *Id.* at ¶ 13.

[6]  *Id.* at ¶ 14.

[7]  *Id.*

[8]  *Id.* at ¶ 16.

[9]  *Id.*

[10]  *Id.* at ¶ 17.

injected into the outfall pipe to mask oil sheen on the ocean surface resulting from ATP's discharge of wastewater containing quantities of oil in excess of its NPDES permit limit."[11] The United States notes that ATP's NPDES permit does not authorize it to use Cleartron ZB-103 and generally states that an operator should minimize the use of any dispersant, because dispersants emulsify oil, thereby increasing toxicity and making the detection of a discharge of oil more difficult.[12]

In response, the United States has brought six causes of action in this matter. First, it seeks civil penalties against ATP for violations of CWA Section 301(a), 33 U.S.C. § 1311(a), and other related sections, for dispersant discharges.[13] Second, the United States brings a cause of action against ATP for permit violations pursuant to CWA Section 309(d).[14] Third, the United States seeks civil penalties against both defendants, ATP and Infrastructure Partners, for oil discharges in violation of CWA Section 311(b).[15] In the United States fourth cause of action, it requests injunctive relief under the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. § 1350(a), against both defendants to remedy the alleged violations of law.[16] In the United States' fifth cause of action, it seeks similar injunctive relief against both defendants pursuant to the CWA Section 309(b).[17]

In the United States' sixth cause of action, it requests a declaratory judgment pursuant to 28 U.S.C. § 2201(a). The United States explains that in August of 2012, ATP filed for Chapter 11

---

[11] *Id.* at ¶ 20.

[12] *Id.* at ¶ 22.

[13] *See id.* at ¶¶ 26-39.

[14] *See id.* at ¶¶ 40-49.

[15] *See id.* at ¶¶ 50-68.

[16] *See id.* at ¶¶ 69-80.

[17] *See id.* at ¶¶ 81-85.

bankruptcy and identified Infrastructure Partners as a "non-debtor entity." The United States acknowledges that under Section 362(a)(1) of the Bankruptcy Code this would normally impose an automatic stay, but Section 362(b)(4) of the Bankruptcy Code expressly states that Section 362(a) will not apply to the "commencement or continuation of an action or proceeding by a governmental unit ... to enforce such governmental unit's ... police and regulatory power, including enforcement of a judgment other than a money judgment." Therefore, the United States seeks a declartory judgment that the police and regulatory exception to the automatic stay applies "to this environmental enforcement action brought pursuant to the enforcement provisions of the Clean Water Act and Outer Continental Shelf Lands Act."[18]

**B. Procedural Background**

The United States filed this action on February 11, 2013.[19] On May 6, 2013, Infrastructure Partners filed the pending motion to dismiss Claims 3, 4, and 5.[20] On June 5, 2013, the United States filed an opposition to the motion to dismiss.[21] With leave of court, Infrastructure Partners filed a reply on June 17, 2013.[22] The Court held oral argument on the pending motion on June 19, 2013.

---

[18] *See id.* at ¶¶ 86-92.

[19] *Id.*

[20] Rec. Doc. 34.

[21] Rec. Doc. 40.

[22] Rec. Doc. 45.

## II. Parties' Arguments

### A. Infrastructure Partners' Argument in Support

In support of the pending motion, Infrastructure Partners argues that Claim 3 should be dismissed because Section 311 of the CWA excludes discharges subject to NPDES permit conditions.[23] Infrastructure Partners notes that Section 311 prohibits the discharge of hazardous oil or substances in quantities that can be harmful, but provides several statutory exceptions to "discharge":

> (2) "discharge" includes, but is not limited to, any spilling, leaking, pumping, pouring, emitting, emptying or dumping, but excludes[:]
>
> (A) discharges in compliance with a permit under section 1342 [CWA § 402] of this title,
>
> (B) discharges resulting from circumstances identified and reviewed and made a part of the public record with respect to a permit issued or modified under section 1342 of this title, and subject to a condition in such permit,
>
> (C) continuous or anticipated intermittent discharges from a point source, identified in a permit or permit application under section 1342 [CWA § 402] of this title, which are caused by events occurring within the scope of relevant operating or treatment systems, and
>
> (D) discharges incidental to mechanical removal authorized by the President under subsection (c) of this section.[24]

Infrastructure Partners avers that the allegations in the complaint pertaining to in Count 3 "fall squarely within Exclusions A and C."[25]

---

[23] Rec. Doc. 34-1 at p. 12.

[24] *Id.* at p. 13 (citing 33 U.S.C. § 1321(a)(2)).

[25] *Id.*

Regarding Exclusion A, Infrastructure Partners states that Congress created this exclusion because it "is possible that an NPDES permit may authorize discharges that would otherwise be unlawful under Section 311 [of the CWA]."[26] Therefore, Infrastructure Partners contends that Exclusion A "prevents a potential conflict between the NPDES permitting regime under Section 401 and the spill prevention and enforcement requirements of Section 311."[27]

Turning to Exclusion C, Infrastructure Partners maintains that this exclusion applies if three conditions are met:

> First, the discharges must be either continuous or anticipated, intermittent discharges. Second, the discharges must be from a point source that has been identified in an NPDES permit or permit application. Third, the discharge must be "caused by events occurring within the scope of the relevant operating or treatment system."[28]

Infrastructure Partners highlights that Exclusion C differs from Exclusion A in that "Exclusion C is not limited to discharges in compliance with the NPDES permit."[29] Instead, Infrastructure Partners argues, Exclusion C is designed to exclude discharges from Section 311 liability even if those "discharges *exceed* NPDES permit limits."[30] Therefore, Infrastructure Partners maintains that "such permit exceedances [sic] would be subject to enforcement under Section 309," and may not be duplicated for enforcement purposes under Section 311.[31]

---

[26] *Id.* (citing 50 Fed. Reg. 9776, 9777 (Mar. 11, 1985)).

[27] *Id.* at pp. 13-14.

[28] *Id.* at p. 14 (quoting 33 U.S.C. § 1321(a)(2)(C)).

[29] *Id.*

[30] *Id.* (emphasis in original).

[31] *Id.* (citing 50 Fed. Reg. 9776, 9778 (Mar. 1, 1985)).

Infrastructure Partners avers that the EPA has explained that Congress added these exclusions to the definition of "discharge" to "clarify the extent to which 'discharges from facilities with NPDES permits were subject to the provisions of section 311.'"[32] Further, Infrastructure Partners argues that Section 311 is meant to govern "classic spill" situations, but that point source discharges permitted under Section 402 is to be regulated by the NPDES program.[33] Infrastructure Partners also cites the legislative history of Section 311, arguing that this explains "Congress's desire to differentiate between enforcement for violations of NPDES permits, on the one hand, and enforcement of spills on the other."[34]

Infrastructure Partners also argues that the EPA's regulatory interpretation of Section 311's exclusions bolsters its position that "no section 311 claim can lie against Infrastructure Partners."[35] According to the EPA, a "discharge" falls within Exclusion A, "if the permit contains an effluent limitation specifically applicable to the substance discharged ... and the discharge is in compliance with the effluent limitation."[36] As such, Infrastructure Partners contends that "oil discharged from an NPDES permit outfall within established permit limits cannot be a 'discharge' under Section 311."[37]

Regarding the EPA's interpretation of Exclusion C's applicability, Infrastructure Partners alleges that the EPA has established a two-part regulatory interpretation. First, the substance must

---

[32] *Id.* (citing 44 Fed. Ref. 10271, 10272 (Feb. 16, 1979) (proposed rule)).

[33] *Id.* at pp. 14-15 (citing federal regulations).

[34] *See id.* at pp. 15-16.

[35] *Id.* at p. 16.

[36] *Id.* at pp. 16-17 (ellipsis in memorandum) (quoting 40 C.F.R. § 117.12(b)).

[37] *Id.* at p. 17.

be discharged from a point source for which a valid permit exists or for which a permit has been submitted.[38] Second, the discharge must result from one of three conditions:

> (i) The contamination of noncontact cooling water or storm water, provided that such cooling water or storm water is not contaminated by an on-site spill of a hazardous substance; or
> (ii) A *continuous or anticipated intermittent discharge of process waste water, and the discharge originates within the manufacturing or treatment systems; or*
> (iii) An upset or failure of a treatment system or of a process producing a continuous or anticipated intermittent discharge where the upset or failure results from a control problem, an operator error, a system failure or malfunction, an equipment or system startup or shutdown, an equipment wash, or a production schedule change, provided that such upset or failure is not caused by an on-site spill of a hazardous substance.[39]

Infrastructure Partners argues that this interpretation means that Exclusion C applies to discharges from treatment facilities even if the discharges do not comply with the permit limits.[40] Instead, "[i]t is enough for coverage under this definition of discharge [when the release] 'originates within the manufacturing or treatment systems.'"[41] Further, Infrastructure Partners notes that "process waste water" is defined as "any water which, during manufacturing or production, comes into direct contact with or results from the production or use of any raw material."[42] Infrastructure Partners argues that courts have "long deferred to statutory interpretations adopted through formal rulemaking."[43] Therefore, Infrastructure Partners contends that this Court should follow the EPA's

---

[38] *Id.* (citing 40 C.F.R. §117.12(d)).

[39] *Id.* (quoting 40 C.F.R. § 117.12(d)(2)) (emphasis added in memorandum).

[40] *Id.*

[41] *Id.* (citing 40 C.F.R. § 117.12(d)(2)(ii)).

[42] *Id.* (citing 40 C.F.R. § 117.1(j)).

[43] *Id.* (citing *Christensen v. Harris Cnty.*, 529 U.S. 576, 587-88 (2000)).

interpretation and definition of "discharge," over a "definition derived without the benefit of such formal mechanisms," as required under the Administrative Procedure Act.[44]

As such, Infrastructure Partners argues that both Exclusions A and C provide independent bases to dismiss Claim 3 for liability under Section 311 of the CWA. Infrastructure Partners notes that Exclusion A exempts "discharges in compliance with a [Section 402] permit."[45] Infrastructure Partners argues that the General Permit applicable to ATP's operations contains limitations for oil discharges as well as a criterion that discharges may not cause a sheen.[46] Infrastructure Partners contends that the complaint does not allege any discharge that exceeded the numeric limitations on oil or that any discharge actually caused sheen, and therefore that Claim 3 must be dismissed.[47]

In addition, Infrastructure Partners argues that all three conditions to implicate Exclusion C are also met, and therefore warrant the dismissal of Claim 3 as well. First, Infrastructure Partners alleges that the "discharges" in question are continuous or anticipated intermittent discharges. Infrastructure Partners notes that in the complaint, the United States alleges that the "discharges" from the outfall pipe occurred "daily" over a period spanning almost 18 months.[48] Moreover, "[t]o the extent that these wastewater discharges occur from a permitted outfall, they are also 'anticipated'

---

[44] *Id.* at pp. 17-18 & n. 10 (citing *Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 57 (1983)).

[45] *Id.* at p. 18 (citing 33 U.S.C. § 1321(a)(2)(A)).

[46] *Id.*

[47] *Id.*

[48] *Id.* (citing Rec. Doc. 1 at ¶ 1).

discharges."[49] Furthermore, Infrastructure Partners maintains that nothing in the complaint claims that the alleged discharges were "spills."

Concerning the second factor, Infrastructure Partners notes that the United States has alleged that the oil from the ATP Innovator only reached the Gulf of Mexico via the NPDES pipe, a permitted point source.[50] Regarding the third prerequisite, whether the "discharges" were cause by events occurring within the scope of the relevant treatment system, Infrastructure Partners argues:

> Read most charitably, the Government argues that the ATP Innovator's wastewater treatment system did not remove sufficient quantities of oil from the wastewater before discharging it via the NPDES outfall pipe (thus, under the Government's theory, rendering the alleged dispersant application necessary to avoid a sheen). Essentially then, the Government's contention is an admission that any such discharges occurred within the scope of the platform's operations and its treatment system.[51]

Therefore, Infrastructure Partners claims that the allegations in Claim 3 are excluded from liability under Section 311, and the claim should be dismissed as a matter of law.[52]

Because Infrastructure Partners contends that it did not violate the OCSLA or CWA, it argues that the claims seeking injunctive relief under those statutes are "untenable."[53] Specific to Claim 4, Infrastructure Partners argues that the United States may not seek injunctive relief under the OCSLA against it, because the United States does not allege that Infrastructure Partners violated any provision of the OCSLA. Infrastructure Partners argues that the provisions cited by the United

---

[49] *Id.*

[50] *Id.* at p. 20 (citing Rec. Doc. 1 at ¶ 14).

[51] *Id.* (citing Rec. Doc. 1 at ¶¶ 15, 20, 25).

[52] *Id.* at pp. 20-21.

[53] *Id.* at p. 21.

States impose obligations on "operators," like ATP, but not Infrastructure Partners as an "owner" of ATP Innovator, and therefore there is no cause of action for an injunction.[54]

Similarly, Infrastructure Partners seeks the dismissal of Claim 5, which seeks injunctive relief for alleged violations of the CWA. However, Infrastructure Partners maintains that "the Complaint does not – and indeed cannot – claim that Infrastructure Partners, the owner of the ATP Innovator and *not* the "person" who allegedly discharged a pollutant from the platform, violated Section 301."[55] Concerning both Claims 4 and 5, Infrastructure Partners argues that "the extent of an injunctive remedy must be tied to the violation of applicable law."[56] Therefore, Infrastructure Partners avers that "because the government has alleged that *only* ATP Oil & Gas has committed actions necessitating an injunction, an injunction including Infrastructure Partners would be overly broad under Fifth Circuit law," and as a result Claims 4 and 5 must be dismissed as against Infrastructure Partners.[57]

### B. United States' Arguments in Opposition

In opposition to the pending motion, the United States contends that Infrastructure Partners "overreaches when it asserts that CWA Section 311 exempts from its liability 'discharges' that are subject to or contemplated by a permit."[58] The United States notes that district courts have affirmed CWA Section 311(b) penalties for oil discharges from a permitted outfall.[59] The United States also

---

[54] *Id.* at pp. 21-22.

[55] *Id.* at pp. 22 (emphasis in original).

[56] *Id.* at p. 23 (citing *Fiber Sys. Int'l, Inc. v. Roehrs*, 470 F.3d 1150, 1159 (5th Cir. 2006)).

[57] *Id.* at p. 24 (emphasis in original).

[58] Rec. Doc. 40 at p. 7 (internal quotation marks omitted).

[59] *Id.* (citing *BP Exploration & Oil, Inc. v. U.S. Dept. of Trnasp.*, 44 F.Supp. 2d 34, 35, 40-41 (D.D.C. 1999)).

argues that:

> Section 311(b)(11) states that civil penalties cannot be assessed under "both" Section 311 and Section 309 – the permit-violation Section – for the same discharge, which tacitly recognizes that oil discharges can be enforced under *either* ATP-IP's use of legislative history is unwarranted in light of the plain language of the statute. provision.[60]

Further, the United States contends that Infrastructure Partners presents an overly narrow defintion of "discharge" that conflicts with the statutory definition in CWA Section 311(a)(2), claiming that the plain language does not limit the applicability of CWA Section 311(b) to accidental "spills."[61] The United States notes that Section 311(a)(2), in defining "discharges," includes, in addition to "spilling," the non-exhaustive list of "leaking, pumping, pouring, emitting, emptying or dumping."[62] The United States rejects Infrastructure Partners' use of legislative history "in light of the plain language of the statute."[63]

Specifically, the United States avers that Exclusion A of CWA Section 311(a)(2) is not applicable based on the allegations in the complaint. The United States notes that Exclusion A excludes "discharges in compliance with a permit." The United States argues that Infrastructure Partners' argument that the complaint does not allege any discharge exceeded the numeric limitations on oil, and therefore was in compliance with the permit, is "patently false."[64] The United States highlights that in paragraph 20 of the complaint it states that the "dispersant was injected into the outfall pipe to mask oil sheen on the ocean surface from ATP's discharge of wastewater containing

---

[60] *Id.* at pp. 7-8 (emphasis in original).

[61] *Id.* at p. 8.

[62] *Id.*

[63] *Id.* n. 2.

[64] *Id.* at pp. 8-9.

quantities of **oil in excess of its NPDES permit limit**."[65]

The United States also rejects Infrastructure Partners' assertion that the complaint does not "allege that any discharge actually caused sheen."[66] The Unites States directs the Court to allegations in the complaint that dispersant was injected into the outflow pipe to make oil sheen on the ocean surface and that the dispersant used was referred to as "the soap" or "the sheen buster."[67]

The United States additionally refutes Infrastructure Partners' argument that Exclusion C of the definition of "discharge" prevents civil liability against Infrastructure Partners in Claim 3. The United States argues that:

> [Infrastructure Partners'] argument for application of Exclusion C is incorrect for at least three independent reasons, any one of which provides grounds for denying the motion to dismiss: (1) the discharges were neither "continuous" nor "anticipated intermittent" discharges identified in a permit or permit application; (2) the discharges were not "caused by" events occurring "within the scope" of relevant treatment systems; and (3) the discharges did not "originate within" the operating or treatment system.[68]

With regard to its first argument that Exclusion C is inapplicable, the United States maintains that "given the prohibitions on dispersant discharges in the regulations and ATP's permit, and the concealed nature of the dispersant injections into the oil flowing through the outfall pipe, it is not remotely credible to argue that the illegal discharges in this case were continuous or anticipated intermittent discharges identified in a permit or permit application."[69]

Second, the United States claims that Infrastructure Partners' assertion that the oil discharges

---

[65] *Id.* at p. 9 (emphasis in memorandum).

[66] *Id.* (citing Infrastructure Partners' Memorandum in Support, Rec. Doc. 34-1 at p. 15).

[67] *Id.* (citing Rec. Doc. 1 at ¶¶ 20-21).

[68] *Id.* at p. 10.

[69] *Id.* at p. 11.

occurred every day during operation of the platform is incorrect and at odds with the factual allegations in the complaint, which must be accepted as true upon a motion to dismiss.[70] The United States argues that in the complaint it has specified an end date for the oil discharges, and therefore they are not "continuous."[71] The United States avers that the discharges "are fairly characterized as episodic spills," which the EPA has acknowledged are not covered by Exclusion C.[72] The United States also challenges Infrastructure Partners' assertion that the allegedly illegal discharges were "anticipated":

> First, given the allegations that the illegal oil discharges were the result of willful misconduct or gross negligence in the operation and maintenance of the platform, [Infrastructure Partners'] assertion that these illegal discharges were "anticipated" is absurd on its face. Such nefarious conduct is not within the realm of anticipation at the permit application stage or at any other time. Second, [Infrastructure Partners] only argues that the discharges were "anticipated," not that the discharges were "anticipated intermittent" discharges under the statute, 33 U.S.C. § 1321(a)(2)(C); to argue "intermittent," of course, would have been at direct odds with its argument that the discharges were "continuous." [Infrastructure Partners] Mem. at 16. Third, [Infrastructure Partners] provides no proof that the willful illegal discharges were "anticipated" or "intermittent."[73]

Moreover, the United States denies Infrastructure Partners' claim that it is exempt from liability pursuant to Exclusion C because the oil discharges were not caused by events occuring within the scope of the relevant treatment systems.[74] "To the contrary, based on a plain reading of the Complaint, the cause of the illegal oil discharges from the ATP Innovator is *the willful failure to operate within the scope* of the operating and treatment systems, including the deliberate injection

---

[70] *Id.*

[71] *Id.* at pp. 11-12.

[72] *Id.* at p. 12 (citing 44 Fed. Reg. 50766, 50769 (Aug. 29, 1979)).

[73] *Id.* at p. 13.

[74] *Id.*

14

of dispersant into the outfall pipe. Factual allegations supporting the willful nature of the violations include the concealed use of the dispersant to mask the oil discharges and the awareness of the purpose and effects of the dispersant."[75]

The United States argues that Infrastructure Partners' position would create a "giant loophole" in the oil enforcement program under the Clean Water Act:

> Under [Infrastructure Partners'] argument, if ATP willfully pumped a thousand barrels of oil (or oily water) through its permitted outfall into the ocean every day, it would be immune from the powerful, volume-based penalty mechanism of CWA Section 311(b), which provides a maximum volumetric penalty liability of $4.3 million each day (1,000 barrels x $4,300 per barrel pursuant to CWA Section 311(b)(7)(D)), and instead would only be liable for a maximum per-day penalty under CWA Section 309(b) of $37,500. Even more quixotic is that if, so goes the theory, ATP willfully dumped the waste just once, it would be subject to penalty under Section 311(b), but if it continued to dump large quantities of oil every day for a long duration it would be immune from Section 311(b). If this were true, it would be an invitation to dump the worst pollutants into the waterways on a grand scale. Undoubtedly, Congress did not create such a loophole in the enforcement scheme of Section 311, which is premised on the national policy that "there should be *no discharges of oil* or hazardous substances into [waterways]." 33 U.S.C. § 1321(b)(1) (emphasis added). This sort of willful conduct, as alleged in the Complaint, clearly would not be within the scope of the operating or treatment systems and therefore remains subject to enforcement under Section 311.[76]

Further, the United States argues that the mixture of oil and chemical dispersant cannot be said to be within the scope of the operating or treatment conditions because the illegal injection of dispersant into the excess oil stream flowing out of the outfall pipe occurred downstream from the treatment systems.[77]

---

[75] *Id.* at pp. 13-14 (emphasis in original).

[76] *Id.* at pp. 14-15.

[77] *Id.* at p. 14.

Moreover, the United States contends that Infrastructure Partners has referred to the incorrect EPA regulations. The United States claims that Infrastructure Partners has cited the regulations pertaining to "hazardous substances," at 40 C.F.R. § 117.12, which regulates the "Determination of Reportable Quantities of Hazardous Substances," and expressly excludes "oil."[78] Instead, the United States avers that the EPA's oil discharge regulations are found in a separate set of regulations at 40 C.F.R. § 110.[79] Nonetheless, the United States argues that even if the Hazardous Substances regulations were to apply, Infrastructure Partners activity would still be considered "discharges."[80]

With regard to the United States' requests for injunctive relief, in Claims 4 and 5, the United States refutes Infrastructure Partners' argument that it cannot be accountable for performing injunctive relief under the OCSLA or CWA because the United States has not alleged that Infrastructure Partners is in violation of those statutes. The United States admits that it "does not allege that [Infrastructure Partners] violated either of the injunctive relief provisions identified in the Complaint," but only that ATP is in violation.[81] The United States argues that Infrastructure Partners, as owner of the platform ATP Innovator, is a "necessary party," as the term is defined pursuant to Federal Rule of Civil Procedure 19(a)(1), and therefore must be joined to accord full relief among the parties.[82] The United States argues that "[w]ithout the owner of the platform as a

---

[78] *Id.* at p. 17 (citing 33 U.S.C. § 1321(b)(2)(A)).

[79] *Id.* at pp. 17-18.

[80] *Id.* at pp. 18-19.

[81] *Id.* at pp. 19-20 & n. 4.

[82] *Id.* at p. 20.

party, the Court's final injunctive relief order pertaining to needed changes to the treatment systems and piping would be unenforceable and ineffective."[83] The United States notes that:

> The violations alleged in this case stem from inappropriate system configuration and insufficiency of wastewater treatment systems on the ATP Innovator, and the United States is seeking injunctive relief to remedy the physical inadequacies on the ATP Innovator that caused or contributed to the illegal discharges, as well as operational practices. In paragraphs 79 and 85, which address each of the injunctive relief claims, the United States clearly alleged the need to enjoin ATP *and* [Infrastructure Partners] in order to ensure that the violations are remedied.
> ....
> As owner of the facility, [Infrastructure Partners] is a required party for complete adjudication and implementation of the injunctive relief measures sought in this case. Without [Infrastructure Partners] as a party in this case, the Court would not be able to effectuate its final injunctive relief order because ATP Oil & Gas Corporation, the current operator of the facility, does not have the right or the financial ability to make the substantial physical changes to the facility that are needed in order to operate properly. The other predicates for mandatory joinder under Rule 19(a) – being subject to service of process, proper venue, and subject-matter jurisdiction – have not been disputed. And given ATP Oil & Gas Corporation is in bankruptcy, and may not re-emerge, [Infrastructure Partners] is likely to be both the owner and *de facto* operator of the platform in the very near future. In fact, just two weeks ago, ATP moved the bankruptcy court for permission to reject its contracts and agreements with [Infrastructure Partners] regarding the use of the ATP Innovator.[84]

Further, the United States maintains that the OCSLA and CWA authorize injunctive relief against Infrastructure Partners to remedy these alleged violations.[85] The United States argues that it is irrelevant that it does not allege that Infrastructure Partners violated these statutes, because the "broad injunctive relief authority" encompassed in these statutes nonetheless empowers courts to grant such relief against parties who are not specifically in violation.[86] The United States directs the

---

[83] *Id.* at pp. 20-21.

[84] *Id.* at pp. 22-23 (emphasis in original).

[85] *Id.* at p. 23.

[86] *Id.* at pp. 23-24.

Court to language within in the OCSLA, which states that a court may authorize injunctive relief "'to enforce any provision of this subchapter, any regulation or order issued under this subchapter, or any term of a lease, license, or permit issued pursuant to this subchapter.'"[87] The United States notes that in the complaint it alleges ATP violated multiple provisions of the OCSLA and its regulations.[88] Similarly, the United States argues that the injunctive relief provisions of the CWA at issue in Claim 5 "provide the court with broad authority to order all 'appropriate relief, including a permanent or temporary injunction, for any violation of,' *inter alia*, Section 301."[89]

Finally, the United States argues that Infrastructure Partners ignores Rule 19(a)'s mandatory joinder provision and "cites no case law to support its argument that it cannot be a party to the OCSLA and Clean Water Act injunctive relief claims."[90] Instead, the United States maintains that the final scope of injunctive relief is a matter to be determined by the Court after trial,[91] and that the complaint makes clear that the United States seeks injunctive relief to "'remedy the specific action necessitating the injunction,' and that the remedy will require some performance by [Infrastructure Partners]."[92]

---

[87] *Id.* at p. 24 (quoting 43 U.S.C. § 1350(a)).

[88] *Id.* (citing Rec. Doc. 1 at ¶¶ 75-78).

[89] *Id.* (quoting 33 U.S.C. § 1319(b)).

[90] *Id.*

[91] *Id.* at p. 25 (citing *SEC v. Jackson*, No. H-12-0563, 2012 WL 6137551, at *31 (S.D. Tex. Dec. 11, 2012)).

[92] *Id.* (quoting *Fiber Sys.*, 470 F.3d at 1159) (internal citations omitted).

*C. Infrastructure Partners' Reply*

In reply, Infrastructure Partners reiterates its argument that the United States has failed to allege the basis for a "discharge" as the term is defined by Section 311 of the CWA.[93] Infrastructure Partners maintains that Exclusions A and C apply to exclude the allegations from the definition of "discharge" and absolve it of any liability under Section 311.[94] Infrastructure Partners also refutes the United States' argument that Infrastructure Partners has cited the wrong regulation, 40 C.F.R. § 117.2, to interpret "discharge" under Section 311; while Infrastructure Partners does not dispute that Section 117.2 governs regulations concerning "hazardous substances," it maintains that this is of no matter because "*the very same definition of "discharge" applies to both oil and hazardous substances.*"[95]

Specific to Exclusion A, Infrastructure Partners addresses the United States' argument that its allegations in paragraph 20 of the complaint foreclose the application of this exclusion at this stage, because "[t]he most natural reading of that Paragraph ... is an allegation of intent on the part of the operator," not a permit violation.[96] Turning next to the United States' contentions with regard to Exclusion C, Infrastructure Partners claims that the United States appears to argue that "continuous" means "interminable."[97] Infrastructure Partners avers that the United States' allegation that discharges occurred "daily" "meet[s] the plain-language meaning on 'continuos.'"[98]

---

[93]   Rec. Doc. 45 at p. 4.

[94]   *Id.* at pp. 4-5

[95]   *Id.* at p. 5 (emphasis in original).

[96]   *Id.* at p. 6.

[97]   *Id.* at p. 7.

[98]   *Id.* at pp. 7-8.

Additionally, in connection to Exclusion C, Infrastructure Partners contends that:

> The Government argues that the oil discharges at issue were not "caused by events" occurring "within the scope" of the treatment system because the operator of the ATP Innovator "inject[ed] dispersant into the outfall pipe" and failed to properly maintain the treatment system. Opp'n at 12. These arguments do not relate to the application of Exclusion C. The only discharges alleged in Count Three (Section 311) are of "oil." Compl. ¶ 60; *see* Opp'n at 17 ("The claim against ATP-IP addresses discharges of oil, not statutory 'hazardous substances.'"). The application of any dispersant after treatment could not affect whether excess oil was discharged from the treatment system: if the treatment system discharged excess oil, the injection of dispersant near the outfall could not physically have had any effect on the amount of oil flowing through the outfall. The amount of oil discharged had already been determined within the treatment system. Therefore, the dispersant could not have "caused" any oil discharge. Infrastructure Partners disputes that ATP Oil & Gas failed to adequately maintain the treatment system, but assuming the truth of that allegation, if any excess oil discharges were caused by treatment system maintenance failures, that would *confirm* that those discharges were "caused by events" occurring "within the scope" of the treatment system.[99]

Infrastructure Partners maintains that the EPA addressed "precisely this issue in its regulations" to exclude from the definition of discharge:

> An upset or failure of *a treatment system* or of a process producing a continuous or anticipated intermittent discharge *where the upset or failure results from a control problem, an operator error, a system failure or malfunction*, an equipment or system startup or shutdown ... provided that such upset or failure is not caused by an on-site spill of a hazardous substance."[100]

Infrastructure Partners contends that the United States alleges that the excess oil was caused by a failure of the treatment center, control problems, and/or operator error, and therefore concedes that these issues are within Exclusion C's ambit.[101] Infrastructure Partners urges the Court to consult the legislative history to confirm the EPA's interpretation if any ambiguity remains:

---

[99] *Id.* at pp. 8-9.

[100] *Id.* at p. 9 (quoting 40 C.F.R. § 117.12(d)(2)(iii)) (emphasis and ellipsis added by Infrastructure Partners).

[101] *Id.*

> Circumstances such as the following would be regulated under Section 309 and 402, **not** section 311: System upsets caused by control problems or operator error, system failures of malfunctions, .... or treatment system upsets or failures.[102]

As such, Infrastructure Partners argues that the United States has alleged "chronic compliance" problems "caused *not* by episodic, unique events, but by failure to comply with permit requirements for proper operation and maintenance," which should be addressed not through Section 311, but rather Sections 309 and 402.[103] Additionally, Infrastructure Partners claims that there "can be no serious dispute that the oil discharges 'originated within' the ATP Innovator's treatment system":

> All treatment systems process pollutants that originate somewhere else; treating such pollution is the purpose of a treatment system, as recognized by EPA's definition of "process waste water" used in the regulations. *See* Mem. at 14. The Government's argument that the chemical at issue must have been *created* within a treatment system makes no sense and, if accepted, would eviscerate Exclusion C.[104]

Despite the United States' argument that Infrastructure Partners' position would create a "giant loophole" in CWA enforcement, Infrastructure Partners argues that this "argument ignores the manner in which Congress chose to address 'willful' violations of the statute."[105] Infrastructure Partners maintains that the "hypothetical situation" described by the United States would be punishable under Section 309 of the CWA. "Congress determined that the criminal provisions of the

---

[102] *Id.* (quoting 124 Cong. Rec. H38686 (daily ed. Oct. 14, 1978)) (emphasis and ellipsis added by Infrastructure Partners).

[103] *Id.* at p. 10.

[104] *Id.* (emphasis in original).

[105] *Id.*

statute were sufficient to deter such violations, and the Government may not add civil penalties that were not included in the statute."[106]

Regarding the claims for injunctive relief and the United States' argument that Infrastructure Partners is a necessary party under Rule 19(a), Infrastructure Partners maintains that this argument "fails because Rule 19 does not enlarge statutory liability."[107] Infrastructure Partners also maintains that its absence will not preclude relief for the injunction claims, and therefore they are not deemed a necessary party.[108] Finally, Infrastructure Partners claims that "the Court may only enjoin a party for which it has found a violation of the underlying statute at issue."[109] Infrastructure Partners argues that "the[re is a] long line of cases holding that without any allegation of a statutory violation, there can be no success on the merits, and thus no injunctive relief."[110]

### III. Standard on a Motion to Dismiss

The Federal Rules of Civil Procedure provide that an action may be dismissed "for failure to state a claim upon which relief can be granted."[111] "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'"[112] "Factual allegations must be enough to raise a right to relief above the speculative

---

[106] *Id.*

[107] *Id.* at p. 11.

[108] *Id.*

[109] *Id.* at p. 12 (citing sources).

[110] *Id.*

[111] Fed. R. Civ. P. 12(b)(6).

[112] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2008)).

level,"[113] and a claim is facially plausible when the plaintiff has pled facts that allow the court to "draw a reasonable inference that the defendant is liable for the misconduct alleged."[114] "[T]he motion to dismiss for failure to state a claim is viewed with disfavor and is rarely granted."[115]

On a motion to dismiss, asserted claims are liberally construed in favor of the claimant, and all facts pleaded are taken as true.[116] However, although required to accept all "well-pleaded facts" as true, the court is not required to accept legal conclusions as true.[117] "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."[118] Similarly, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements" will not suffice.[119] The complaint need not contain detailed factual allegations, but it must offer more than mere labels, legal conclusions, or formulaic recitations of the elements of a cause of action.[120] That is, the complaint must offer more than an "unadorned, the defendant-unlawfully-harmed-me accusation."[121] From the face of the complaint, there must be enough factual matter to raise a reasonable expectation that discovery will reveal evidence as to each element of the asserted

---

[113] *Twombly*, 550 U.S. at 556.

[114] *Id.* at 570.

[115] *Kaiser Aluminum & Chem Sales, Inc. v. Avondale Shipyards, Inc.*, 677 F.2d 1045, 1050 (5th Cir. 1982) (internal quotation marks omitted).

[116] *Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 164 (1993); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007).

[117] *Iqbal*, 556 U.S. 662, 677-78.

[118] *Id.* at 679.

[119] *Id.* at 678.

[120] *Id.*

[121] *Id.*

claims.[122] If factual allegations are insufficient to raise a right to relief above the speculative level, or if it is apparent from the face of the complaint that there is an "insuperable" bar to relief, the claim must be dismissed.[123]

### IV. Law and Analysis

#### A. Claim 3- Civil Penalties Under the CWA Section 311(b)

Section 311(b) of the CWA, codified in the United States Code at 33 U.S.C. § 1321(b), authorizes the United States to seek civil penalties for alleged oil "discharges." Specifically, the section states:

> (6) Administrative penalties
>
> (A) Violations
>> Any **owner**, operator, or person in charge of any vessel, onshore facility, or offshore facility--
>> (i) from which oil or a hazardous substance is discharged in violation of paragraph (3), or
>> (ii) who fails or refuses to comply with any regulation issued under subsection (j) of this section to which that owner, operator, or person in charge is subject, may be assessed a class I or class II civil penalty by the Secretary of the department in which the Coast Guard is operating, the Secretary of Transportation, or the Administrator.[124]

Infrastructure Partners is the unrefuted owner of the ATP Innovator, and therefore is expressly included within the ambit of this provision. As noted by Infrastructure Partners, "discharge" is defined in the CWA and includes several specific exclusions:

---

[122]  *Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 257 (5th Cir. 2009).

[123]  *Moore v. Metropolitan Human Serv. Dep't*, No. 09-6470, 2010 WL 1462224, at * 2 (E.D. La. Apr. 8, 2010) (Vance, C.J.) (citing *Jones v. Bock*, 549 U.S. 199, 215 (2007); *Carbe v. Lappin*, 492 F.3d 325, 328 & n. 9 (5th Cir. 2007)).

[124]  33 U.S.C. § 1321(b)(6)(A)(i)-(ii) (emphasis added).

(2) "discharge" includes, but is not limited to, any spilling, leaking, pumping, pouring, emitting, emptying or dumping, but excludes *(A) discharges in compliance with a permit under section 1342 of this title,* (B) discharges resulting from circumstances identified and reviewed and made a part of the public record with respect to a permit issued or modified under section 1342 of this title, and subject to a condition in such permit, *(C) continuous or anticipated intermittent discharges from a point source, identified in a permit or permit application under section 1342 of this title, which are caused by events occurring within the scope of relevant operating or treatment systems,* and (D) discharges incidental to mechanical removal authorized by the President under subsection (c) of this section.[125]

Here, Infrastructure Partners contends that both Exclusions A and C independently immunize it from liability under Claim 3.

### 1. Exclusion A

Despite Infrastructure Partners' arguments as to the applicability of Exclusion A, as the United States has noted, in the complaint the United States specifically alleges that "Cleartron ZB-103 dispersant was injected into the outfall pipe to mask oil sheen on the ocean surface resulting from ATP's discharge of wastewater containing quantities of oil *in excess of its NPDES permit limit.*"[126] In reply, Infrastructure Partners has argued that "[t]he most natural reading of that Paragraph ... is an allegation of intent on the part of the operator."[127] However, "the most natural reading" is not the standard applicable to a motion to dismiss.  Upon a motion to dismiss, "the district court must accept all well-pleaded facts as true and view them *in the light most favorable to the plaintiff.*"[128] Accepting all allegations in the complaint as true and reading it in the light most favorable to the United States, which this Court must do upon a motion to dismiss, the United States

---

[125] 33 U.S.C. § 1321(a)(2) (emphasis added).

[126] Rec. Doc. 1 at ¶ 20.

[127] Rec. Doc. 43-2 at p. 6.

[128] *Baker v. Putnal*, 75 F.3d 190, 196 (5th Cir. 1996) (emphasis added).

has alleged facts that would not be covered by Exclusion A, because it alleges activity not in compliance with the NDPES permit. Therefore, the Court must deny the pending motion on this issue.

### 2. Exclusion C

From the language of the statute, there appear to be three conditions that must be present for Exclusion C to apply: (1) the discharges are "continuous" or "anticipated intermittent" discharges; (2) from a point source identified in a permit or permit application; and (3) the discharges are caused by events occurring within the scope of relevant operating or treatment systems.[129]

Regarding the first condition, Infrastructure Partners argues that because the United States alleges that the discharges occurred "daily,"[130] it has somehow conceded that the discharges were "continuous."[131] Additionally, Infrastructure Partners contends that because the alleged discharges occurred from a permitted outfall, thereby satisfying the second condition, they were also "anticipated" discharges.[132] Finally, in connection to the third condition, Infrastructure confusingly argues that:

> Read most charitably, the Government argues that the ATP Innovator's wastewater treatment system did not remove sufficient quantities of oil from the wastewater before discharging it via the NPDES outfall pipe (thus, under the Government's theory, rendering the alleged dispersant application necessary to avoid a sheen). Essentially then, the Government's contention is an admission that any such

---

[129] 33 U.S.C. § 1321(a)(2).

[130] *See* Rec. Doc. 1 at ¶ 38 ("On information and belief, the dispersant discharges occurred daily during a period to be determined by the Court, but which includes at least October 2010 to March 20, 2012.").

[131] Rec. Doc. 34-1 at p. 18.

[132] *Id.*

discharges occurred within the scope of the platform's operations and its treatment system.[133]

The Court finds Infrastructure Partners' arguments unavailing. First, while the United States has alleged that the discharges occurred "daily," this does not mean that they were "continuous." "Continuous" would imply that the discharges never stopped. Such an allegation does not appear in the complaint, and reading the complaint in the light most favorable to the United States, this Court can construe that the United States has alleged "episodic spills," which would not satisfy this condition of Exclusion C.[134] Further, Infrastructure Partners' argument that the discharges were "anticipated" because they came from a permitted source point is circular and would read out of Exclusion C the first condition discussed above. In addition to the discharges being "continuous" or "anticipated intermittent" discharges, Exclusion C expressly requires that the discharge occur from a permitted point source. However, Infrastructure Partners argues that because the discharges came from a permitted point source, they were anticipated. If this were true, the inclusion of the first condition listed in Exclusion C would be superfluous.

While the Court's finding on this factor would alone foreclose the application of Exclusion C for purposes of the pending motion, the United States' allegations in the complaint also preclude the satisfaction of the third factor as well.[135] Again, Infrastructure Partners employs the same flawed logic as outlined above. Infrastructure Partners argues that because the alleged discharges were released via the NPDES outfall pipe, the United States has admitted "that any such discharges

---

[133] *Id.* at p. 20.

[134] *See* Rec. Doc. 40 at p. 12; *see also* 44 Fed. Reg. 50766, 50769 (Aug. 29, 1979).

[135] The second factor does not appear to be dispute. The complaint makes no allegation that the alleged discharges occurred from any other source other than the NPDES-approved outfall.

occurred within the scope of the platform's operations and its treatment system."[136] If this were a correct application of the law, then Exclusion C would have been better drafted by only including the language that discharges must be "from a point source, identified in a permit or permit application under section 1342 of this title," as under Infrastructure Partners' interpretation the other two conditions depend entirely on the point source of the "discharge." "[W]hen interpreting a statute, it is necessary to give meaning to all its words and to render none superfluous."[137]

     This foundational concept of statutory interpretation also undercuts Infrastructure Partners' reply to the United States' argument that Infrastructure Partners' interpretation of Exclusion C would create a "giant loophole." Infrastructure Partners contends that the United States' opposition, "ignores the manner which Congress chose to address 'willful violations of the statute," because other provisions would punish such alleged "willful" violations.[138] First, this argument would not cure the fact that Infrastructure Partners' interpretation of Exclusion C would render portions of the provision superfluous as described above, and in violation of the principles of statutory interpretation. Moreover, the provision Infrastructure Partners cites to claim that other statutes address "willful" violations, 33 U.S.C. § 1319(c)(2) sets out ***criminal penalties*** for permit violations.[139] Alternatively,  33 U.S.C. § 1321(b)(7)(A), or Section 311(b)(7)(A) of the CWA, imposes ***civil penalties*** on a party who discharges oil or other hazardous substances in violation of

---

[136] *See* Rec. Doc. 34-1 at p. 20.

[137] *United States v. Rayo-Valdez*, 302 F.3d 314, 318 (5th Cir. 2002) (citing *TRW, Inc. v. Andrews*, 534 U.S. 19 (2001)).

[138] *See* Rec. Doc. 45 at p. 10 (citing 33 U.S.C. § 1319(c)(2)).

[139] 33 U.S.C. § 1319(c).

28

the CWA.[140] Therefore, Infrastructure Partners' argument that imposing liability on it under the provisions cited by the United States would somehow be redundant is unpersuasive, and unsupported by the statutes which expressly allow for civil penalties for discharges in violation of the CWA.

The United States has specifically alleged in the complaint that Infrastructure Partners is responsible for "discharge[s] of wastewater containing quantities of oil in excess of its NPDES permit limit."[141] This allegation clearly sets out events occurring *outside* the scope of the relevant operating or treatment systems, and therefore foreclosing the application of Exclusion C for the purposes of the pending motion to dismiss.

Moreover, as the United States has emphasized, Infrastructure Partners' interpretation and application of Exclusion C would produce absurd results.[142] Infrastructure Partners' interpretation

---

[140] *See* 33 U.S.C. § 1321(b)(7)(A). The relevant provision of this statute actually reads that civil penalties may be imposed if "oil or a hazardous substance is discharged in violation of paragraph (3)." *See id.* The referenced "paragraph (3)" reads:

> (3) The discharge of oil or hazardous substances (i) into or upon the navigable waters of the United States, adjoining shorelines, or into or upon the waters of the contiguous zone, or (ii) in connection with activities under the Outer Continental Shelf Lands Act [43 U.S.C.A. § 1331 et seq.] or the Deepwater Port Act of 1974 [33 U.S.C.A. § 1501 et seq.], or which may affect natural resources belonging to, appertaining to, or under the exclusive management authority of the United States (including resources under the Magnuson-Stevens Fishery Conservation and Management Act [16 U.S.C.A. § 1801 et seq.] ), in such quantities as may be harmful as determined by the President under paragraph (4) of this subsection, is prohibited, except (A) in the case of such discharges into the waters of the contiguous zone or which may affect natural resources belonging to, appertaining to, or under the exclusive management authority of the United States (including resources under the Magnuson-Stevens Fishery Conservation and Management Act), where permitted under the Protocol of 1978 Relating to the International Convention for the Prevention of Pollution from Ships, 1973, and (B) where permitted in quantities and at times and locations or under such circumstances or conditions as the President may, by regulation, determine not to be harmful. Any regulations issued under this subsection shall be consistent with maritime safety and with marine and navigation laws and regulations and applicable water quality standards.

33 U.S.C. § 1321(b)(3).

[141] Rec. Doc. 1 at ¶ 20.

[142] *See* Rec. Doc. 40 at pp. 14-15.

of Exclusion C would expose the one-time polluter to civil monetary liability, but protect the

"continuous" or "episodic" polluter as long as it continued to pollute. Further, Infrastructure Partners'

suggested application of the law would absolve all discharges, regardless of their contents and the

limits of the relevant NPDES permit, so long as the discharges were released from a point source

identified in the NPDES permit. Such a construction would undercut the legislative purpose of the

OCSLA and CWA to curtail pollution. "[I]nterpretations of a statute which would produce absurd

results are to be avoided if alternative interpretations consistent with the legislative purpose are

available."[143] Therefore, accepting all of the United States' allegations in the complaint as true,

Exclusion C does not apply to indemnify Infrastructure Partners from liability as to Claim 3.

*B. Claims 4 and 5 - Injunctive Relief Under the OCSLA and CWA*

### 1. Whether the United States Has Stated a Claim for Which Relief Can be Granted

The United States Supreme Court has held that:

[A] plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief. A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.[144]

The OCSLA specifically authorizes injunctive relief to enforce its provisions:

(a) Injunctions, restraining orders, etc.
At the request of the Secretary, the Secretary of the Army, or the Secretary of the Department in which the Coast Guard is operating, the Attorney General or a United States attorney shall institute a civil action in the district court of the United States for the district in which the affected operation is located for a temporary restraining order, injunction, or other appropriate remedy to enforce any provision of this

---

[143] *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982).

[144] *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

subchapter, any regulation or order issued under this subchapter, or any term of a lease, license, or permit issued pursuant to this subchapter.[145]

Similar to the OCSLA, the CWA also authorizes the United States to initiate an action seeking injunctive relief for violations of the CWA:

> The Administrator is authorized to commence a civil action for appropriate relief, including a permanent or temporary injunction, for any violation for which he is authorized to issue a compliance order under subsection (a) of this section. Any action under this subsection may be brought in the district court of the United States for the district in which the defendant is located or resides or is doing business, and such court shall have jurisdiction to restrain such violation and to require compliance. Notice of the commencement of such action shall be given immediately to the appropriate State.[146]

Infrastructure Partners argues that these causes of action against it must fail because the United States has not alleged that Infrastructure Partners has violated any relevant provision of the OCSLA or CWA. The United States argues that the OCSLA and CWA provide courts with "broad injunctive relief authority," which permit courts to grant injunctive relief against a party not in violation of the OCSLA or CWA if it is necessary to enforce the provisions of these statutes.

In reply, Infrastructure Partners argues that without an allegation that it violated the statutes that allow for injunctive relief, the United States could not possibly demonstrate success on the merits.[147] In support, Infrastructure Partners cites *Dresser-Rand Co v. Virtual Automation Inc.*,[148] wherein the Fifth Circuit stated that "[a]t common law, for a permanent injunction to issue the plaintiff must prevail on the merits of his claim and establish that equitable relief is appropriate in

---

[145] 43 U.S.C. § 1350(a).

[146] 33 U.S.C. § 1319(b).

[147] Rec. Doc. 45 at p. 12.

[148] 361 F.3d 831 (5th Cir. 2004).

all other respects."[149] Additionally, Infrastructure Partners cites the Southern District of Mississippi

in *Horne v. Time Warner Operations, Inc.*,[150] where the court stated that "[a] claim for injunctive

relief does not stand alone, but requires a viable underlying legal claim."[151] At oral argument,

Infrastructure Partners relied heavily on the Fifth Circuit's decision in *Fiber Systems Intern., Inc. v.*

*Roehrs*,[152] where the court stated that "'[T]he scope of injunctive relief is dictated by the extent of

the violation established,' and an injunction must be narrowly tailored to remedy the specific action

necessitating the injunction."[153] Infrastructure Partners argues that this language suggests that the

party against whom injunctive relief is sought must be in direct violation of the statute authorizing

injunctive relief.

The true question before this Court in determining whether the United States has stated a

claim upon which relief can be granted with regard to Claims 4 and 5 concerns the extent of a

district court's power to grant injunctive relief. In *Porter v. Warner Holding Co.*,[154] the United States

Supreme Court articulated the broad equitable powers of district courts, especially when public

interests are involved, such as with the suit at bar:

> Unless otherwise provided by statute, all the inherent equitable powers of the District
> Court are available for the proper and complete exercise of that jurisdiction. [Where]
> the public interest is involved in a proceeding of this nature, those equitable powers

---

[149] *Id.* at 847.

[150] 119 F.Supp. 2d 624 (S.D. Miss. 1999).

[151] *Id.* at 631.

[152] 470 F.3d at 1159.

[153] *Id.* (quoting *John Doe # 1 v. Veneman*, 380 F.3d 807, 818 (5th Cir. 2004)).

[154] 328 U.S. 395 (1946).

assume an even broader and more flexible character than when only a private controversy is at stake.[155]

Moreover, the Supreme Court elaborated that:

> if necessary, persons not originally connected with the litigation may be brought before the court so that their rights in the subject matter may be determined and enforced. In addition, the court may go beyond the matters immediately underlying its equitable jurisdiction and decide whatever other issues and give whatever other relief may be necessary under the circumstances. Only in that way can equity do complete rather than truncated justice.[156]

The Fifth Circuit has continued to apply *Porter* and will not interfere with a district court's equitable powers *unless* there is some "words []or inference that justify [such an] encroach[ment]."[157] This jurisprudence from the Supreme Court and Fifth Circuit emphasizes the broad and "flexible" equitable powers of district courts; such powers are at their apex when the public interest is involved. Accepting the allegations in the complaint as true, which again this Court must do when considering a motion to dismiss, the public interest is certainly implicated. Moreover, the injunctive provisions of the OCLSA and CWA cited above in no way state or imply an intention to curtail the district courts' equitable powers. Therefore, the Court finds that the United States has stated a claim upon which relief can be granted in Claims 4 and 5 against Infrastructure Partners, even though the United States has not alleged that Infrastructure Partners violated these provisions of the OCLSA or CWA, because Infrastructure Partners, as owner of the ATP Innovator, may need to be included in any equitable relief this Court may impose to secure complete, rather than "truncated," relief.[158]

---

[155] *Id.* at 398.

[156] *Id.*

[157] *Ruiz v. Johnson*, 178 F.3d 385, 394 (5th Cir. 1999) (citing *Porter*, 328 U.S. at 398)).

[158] *See Porter*, 328 U.S. at 398.

In addition, the Court notes that the United States has also provided persuasive authority to support its argument that Infrastructure Partners' inclusion in this matter may also be appropriate under Federal Rule of Civil Procedure 19(a).[159]

### 2. Potential Mootness

On the eve of oral argument, Infrastructure Partners filed a notice into the record, notifying the Court of a "Decommissioning Order for Lease OCS-G 14016 (Mississippi Canyon Block 711)," the location where the ATP Innovator platform is located.[160] Infrastructure Partners avers that "[t]he Decommissioning Order may bear on Counts 4 and 5 of the Complaint,"[161] and posited at oral argument that this development may make moot Claims 4 and 5. The United States "vehemently" disagreed with this contention. However, the Court finds that consideration of this recent development would both be premature and inappropriate at this time. Motions to dismiss are based solely on the pleadings, and a court may not consider other evidence, such as the Decommissioning Order submitted by Infrastructure Partners.[162] Infrastructure Partners has other mechanisms available to it to raise this argument later.

---

[159] *See United States v. Cundiff*, 555 F.3d 200, 213 n. 7 (6th Cir. 2009) ("The Cundiffs also assert that Seth Cundiff should have been dismissed from the lawsuit because, while he unquestionably owned part of the wetlands, he had leased them back to his father, Rudy Cundiff, and only Rudy engaged in any of the disputed activities. This argument fails, however, because even though he leased his tract, Seth Cundiff both owned it and had knowledge of Rudy Cundiff's activities. So the district court did not abuse its discretion in denying the motion to dismiss Seth Cundiff from the lawsuit."); *United States v. Confederate Acres Sanitary Sewage & Drainage Sys. Inc.*, 935 F.2d 796, 798 (6th Cir. 1991) ("[T]he United States moved to join MSD in this litigation under Federal Rule of Civil Procedure 19(a), arguing that the court could both end Confederate Acres' CWA violations and protect public health by involving MSD in the remedy."); *Lykins v. Westinghouse Elec. Corp.*, 715 F.Supp. 1357, 1359-60 (E.D. Ky. 1989).

[160] Rec. Doc. 46.

[161] *Id.*

[162] *Fee v. Herndon*, 900 F.2d 804, 807 (5th Cir. 1990) ("[Upon a motion to dismiss] [w]e may not go outside the pleadings and must accept all well-pleaded facts as true, viewing them most favorably to the plaintiffs.").

### V. Conclusion

For the reasons stated above, Infrastructure Partners' arguments for the dismissal of Claim 3 fail when the allegations in the complaint are accepted as true and read in the light most favorable to the United States. With regard to Claims 4 and 5, which concern injunctive relief under the OCSLA and CWA, controlling precedent indicates that a district court's equitable powers are considerable in the absence of a specific or express limitation, especially when, as here, the public interest is concerned. Therefore, the Court finds that the United States has stated a claim upon which relief can be granted against Infrastructure Partners for Claims 4 and 5. Accordingly,

**IT IS HEREBY ORDERED** that Infrastructure Partners' Motion to Dismiss[163] is **DENIED**.

**NEW ORLEANS, LOUISIANA**, this  30th day of June, 2013.

**NANNETTE JOLIVETTE BROWN**
**UNITED STATES DISTRICT JUDGE**

---

[163]  Rec. Doc. 34.

35